UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

GERALDINE ECKSTEIN,

    Plaintiff,

-vs-                                            CASE NO. 2:07-cv-641-FtM-29DNF

MICHAEL J. ASTRUE,
**Commissioner of Social Security,**

    **Defendant.**
_____/

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

    The Plaintiff, Geraldine Eckstein, appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for social security disability and disability insurance benefits. For the reasons set forth below, it is recommended that this case be **REVERSED AND REMANDED** pursuant to 42 U.S.C. § 405(g). .

    The Commissioner has filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties have filed legal memorandums.

    **I.    SOCIAL SECURITY ACT ELIGIBILITY, THE ALJ DECISION, AND STANDARD OF REVIEW**

    The Plaintiff is entitled to disability benefits when she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which

1

can be expected to either result in death or last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423 (d) (1)(A); 1382c(a)(3)(A). The Commissioner has established a five-step sequential evaluation process for determining whether the plaintiff is disabled and therefore entitled to benefits. *See* 20 C.F.R. § 416.920(a)-(f); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

On or about April 15, 2004, the Plaintiff filed an application for disability insurance benefits asserting a disability onset date of October 12, 1996. [Tr. 19]. The Plaintiff's application was denied initially, and she has exhausted her administrative remedies. The Plaintiff meets the non-disability requirements for a period of disability and disability insurance benefits set forth in section 216(I) of the Social Security Act through December 31, 2001. [Tr. 19]. The Plaintiff must prove that she was disabled on or before that date. 20 C.F.R. § 404.131(a)(1999).

The Decision of Administrative Law Judge (ALJ) Edward J. Banas dated August 6, 2005 [Tr. 21], denied the Plaintiff's claim for disability insurance benefits. At Step 1 the ALJ found the Plaintiff had not engaged in substantial gainful activity since October 12, 1996, which is her alleged date of disability onset (20 C.F.R. § § 404.1520(b) and 416.920(b)). [Tr. 21]. At Step 2 the ALJ found the Plaintiff has the following severe impairments: complications due to gastric bypass surgery, hypertension, hypothyroidism, fibromyalgia, osteoarthritis, live bile reflux disease and extreme pain in her hands, back and legs when using them for extended periods of time. [Tr. 63]. At Step 3 the ALJ found these impairments did not meet or equal, either singly or in combination with any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1,

Regulations No. 4 (20 C.F.R 404.1520(d) and 416.920(d). [Tr. 22]. At Step 4 the ALJ determined the Plaintiff was able to perform her past relevant work as a beautician. [Tr. 23]. Since the ALJ finds that the Plaintiff is not disabled and has not been disabled for any time relevant to this decision, it is not necessary to consider the remaining step in the sequential evaluation process. [Tr. 23].]. The Plaintiff sought review by the Appeals Council. The Plaintiff's request was denied on August 15, 2006. [Tr. 10-12].

## II. REVIEW OF FACTS

The Plaintiff was born on October 12, 1946, and was 55 years old when her insured status expired on December 31, 2001. [Tr. 23]. The Plaintiff graduated from high school and attended vocational training for cosmetology. The Plaintiff was a proprietor [at home] of a beauty shop and a beautician for approximately 15 years. The Plaintiff also worked as a phlebotomist for a few months between May 1996 and July 1996. [Tr. 64]. The Plaintiff closed her business due to her health problems in December 1996. [Tr. 117]. The Plaintiff did apply for social security disability benefits at that time, but was denied. The Plaintiff alleges disability due to hypertension, hypothyroid, fibromyalgia, osteoarthritis and lower reflux disease [Tr. 63] The Plaintiff's records from Thomas Jefferson University Hospital revealed that the Plaintiff had left vein stripping in 1993, and a repair of her right knee (torn meniscus) in 1995. [Tr. 119].

Prior to the Plaintiff's stopping work, she weighed approximately 180 lbs. In 1998, the Plaintiff weighed 260 lbs. and was diagnosed with morbid obesity. [Tr. 118-119]. The Plaintiff was admitted to the hospital and was scheduled for a gastric bypass with a gastrojejunostomy.. At the time of admission, the Plaintiff was taking: Norvase, Hydrochlorothiazide, Cozaar, Zoloft, Xanax, Relaften and Lanoxen. The surgery was performed on July 17, 1996, and the Plaintiff

tolerated the procedure well. The Plaintiff was released on July 22, 1996, and was instructed to keep the wound clean and watch her temperature closely. [Tr. 119-120]. After surgery, the Plaintiff testified that she had a staph infection which kept her bedridden and she went weekly to Philadelphia to have the surgical site drained. [Tr. 323].

In June 2000, the Plaintiff was admitted to the hospital for an esophagogastro-duodenoscopy (EGD). The Plaintiff's preoperative diagnosis was nausea, vomiting, abdominal discomfort and a history of gastric bypass surgery. The record shows that the Plaintiff tolerated the procedure well. Dr. Azeem Khan's notes "[ I]MPRESSION: Gastritis, esophagitis, status post dilatation of anastomotic site for gastric bypass surgery. Possible bile acid reflux into the stomach and into the esophagus". [Tr. 126]. Dr. Azeem Khan recommended follow-up on the biopsy and pathology. He continued the patient on Prevacid and added Questran since it appeared the Plaintiff's discomfort might be related to bile acid reflux. The Plaintiff was to return in two weeks for follow-up. [Tr. 127].

In July of 2000, the Plaintiff was admitted to the emergency room with a diagnosis of acute penumonia/pneumonitis and acute aspiration of bile. The Plaintiff was admitted to the medical floor and treated with intravenous Tequin, Humibid, Ventolin inhaler and hydration. The Plaintiff improved, her walking was normal and there were no further symptoms. The Plaintiff was released the next day with medications and instructions to see her surgeon about her chronic reflux problem; follow-up with a PA/lateral chest x-ray in six to eight weeks and to see her primary physician, Dr. Schwartz. [Tr. 133-137].

In September of 2000, the Plaintiff was admitted to the hospital because of "persistent bile reflux and chronic cholecystitis". [Tr. 150]. Dr. James Colberg's notes indicated that the

4

"patient had a gastric bypass 2 years ago, and she has been bothered with persistent bilateral reflux. On work-up, it was noted that she also had gallstones which was probably contributing to her symptoms." [Tr. 150-151]. The Plaintiff's final diagnosis: "[S]tatus Post Revision of Jejunostomy and Cholecystectomy". Dr. Colberg's notes states that "[t]he patient tolerated this procedure well. There were no complications postoperatively. The patient did well." " .... She was told to follow up with Dr. Colberg in the office in 1-2 weeks. [Tr. 153].

After the revision surgery, there is no record of problems or additional treatment until April 2, 2001, when the Plaintiff underwent a physical examination prior to having abdominoplasty (surgery to remove excess skin from the abdomen). [Tr. 156]. The Plaintiff reported that she was "[p]resently doing well" although she still was having bile reflux. [Tr. 156]. The procedure was performed by Dr. John H. Moore, Jr., with no complications reported. [Tr. 161-162].

In August of 2001, the Plaintiff underwent a biopsy of "[t]wo distinct superficial 8 to 10 mm. anastomotic ulcers, benign appearing". These were biopsied and it was recommended by Richard M. Troum, D.O., that the Plaintiff be given Nexium and Reglan because of her chronic nausea, vomiting and her episodes of aspiration. The Plaintiff was advised to return within twelve weeks to document the ulcer healing and rule out malignant transformation. On August 9, 2001, a colonoscopy was performed which revealed small internal hemorrhoids and Dr. Troum gave the Plaintiff a clean bill of health. [Tr. 177]. The Plaintiff was rechecked on October 16, 2001 by Dr. Troum and he noted that the ulcers had healed and that the Plaintiff was doing extremely well on Nexium. [Tr. 180]. On November 17, 2001, the Plaintiff was seen in the emergency room for a urinary tract infection. [Tr. 183]. [Again the Plaintiff's insured status

ended December 31, 2001].

The Plaintiff was seen by Dr. Linda Brecher, a rheumatologist in May of 2002 (after her DLI). Dr. Brecher noted that she had last seen the Plaintiff more than three years prior at her old office. At that time the Plaintiff had been evaluated for a rash, positive ANA and diffuse pain. Additionally, (1996) she had diagnosed the Plaintiff with fibromyalgia. [Tr. 193]. Dr. Brecher noted that the Plaintiff had diffuse joint pain; had stiff and swollen joints and had difficulty bending the knuckles of her hands. The greatest degree of pain was in the small joints of her hands as well as the base of her thumbs and bilateral knees. Dr. Brecher diagnosed symptoms of Raynaud's phenomenon and her medications consisted of Norvasc, Levoxyl, Celebrex and Nexium.

The June 26, 2002, visit showed that the Plaintiff's symptoms continued to be the same. The Plaintiff's left ankle had mild soft tissue swelling and mild tenderness of the postural tibial tendon of the medial ankle. The Plaintiff had mild crepitus of the knees and diffuse palpable tenderness including all of the tender points involved with fibromyalgia. [Tr. 192].

In December 2002, the Plaintiff relocated from New Jersey to Florida and she was evaluated by Dr. Boyd Clemens. Although post DLI, in December of 2002, Dr. Clemens assessment showed that the Plaintiff continued to have "bile reflux post gastric bypass, hypertension, osteoarthritis and hypothyroidism, consistent with her past medical problems. [Tr. 211].

On December 29, 2003, the Plaintiff was seen by Seble Gabre-Madhin, M.D. He confirmed that the Plaintiff's symptoms improved after her revision surgery and noted that the gastric bypass operation in 1998 was successful in generating the Plaintiff's weight loss. [Tr.

228-229].

Upon review of the Plaintiff's medical evidence, the ALJ noted that the Plaintiff's treating physicians did not find she had functional limitations prior to the expiration of her insured status. [Tr. 23]. On May 17, 2005, Dr. Irene Viola, submitted a fibromyalgia questionnaire and advised that the Plaintiff experienced constant pain and found her limited to sedentary work. [Tr. 277-85]. However, Dr. Viola did not treat the Plaintiff until October 2003, which was almost 2 years after the expiration of her insured status, and had not seen or examined the Plaintiff prior to her date last insured. [Tr. 280]. *Siterlet v. Secretary of Health & Human Services,* 823 F.2D 918, 920 (6th Cir. 1987).

On November 12, 2004, Ann C. Aldridge, M.D., a state agency physician, reviewed the Plaintiff's medical records and considered the Plaintiff ability to function during the relevant time period of October 10, 1996 through December 31, 2001. [Tr. 265-72].[1] Dr. Aldridge noted the Plaintiff's gastric bypass surgery in 1998; the revision surgery in September 2000; and the abdominoplasty in April 2001. [Tr. 166]. Dr. Aldridge found the Plaintiff's body mass index remained less than 30 since the bypass surgery and her hypertension was well-controlled and that although the medical records intermittently mentioned a diagnosis of fibromyalgia during the relevant period of October 1996 to December 2001; the Plaintiff was not taking medication for fibromyalgia and denied arthalgias and myalgias during the relevant time period. [Tr. 266-267]. There was no documentation of clinically significant osteoarthritis during this period. [Tr. 267].

---

[1] State agency medidcal or psychological consultants are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation. 20 C.F.R. § 404.1527 (f)(2)(1). The ALJ may rely on the findings of a non-examining physician in denying a claimant's application for disability benefits. *Edwards v. Sullivan*, 937 F.2d 580 (11th Cir. 1991).

Dr. Alridge concluded that the Plaintiff was capable of performing light work prior to her date last insured. [Tr. 266].

The ALJ afforded Dr. Aldridge's opinion significant weight because it specifically addressed the period at issue, was supported by the objective findings made during the period at issue, and was consistent with the lack of treatment for fibromyalgia prior to the Plaintiff's date

### III. SPECIFIC ISSUES AND CONCLUSIONS OF LAW

#### A. THE ADMINISTRATIVE LAW JUDGE ERRED IN ASSESSING THE PLAINTIFF'S CREDIBILITY

The plaintiff contends that the ALJ incorrectly found that the "claimant's allegations regarding the effects of her reflux and the limitations caused by her fibromyalgia prior to her dated last insured ["DLI"] are not supported by the medical evidence of record." [Tr. 22]. Further, that the ALJ incorrectly found that the "claimant's testimony, unfortunately, only briefly addressed her pain and limitations prior to her DLI, and did not include activities of daily living prior to that time or discussion of her specific functional abilities." [Tr. 22].

At the hearing, the Plaintiff testified that she had to "[t]aper down her business and actually since '96 has not been able to sustain any full time employment due to her combination of impairments." [Tr. 319]. The Plaintiff closed her business in 1996 because she was unable to stand or bend over and further that she was up to thirteen medications every morning. [Tr. 322]. The Plaintiff testified that the staph infection (after the bypass surgery), kept her bedridden for four months and consisted of a weekly trip to Philadelphia to have it drained and packed by a physician..

The Plaintiff's medical condition (the gastric bypass surgery and her fibromyalgia) were

8

both objectively diagnosed and were confirmed by her physician, Dr. Linda Brecher, the Plaintiff's rheumatologist and confirmed by Dr. Boyd Clemens. However, the ALJ opined that there were no records in the administrative file showing treatment for fibromyalgia during that time period, and only surgical records existed, with no showing of ongoing treatment or supporting her functional limitations. [Tr. 22]. While it is true that records appear to be missing concerning the Plaintiff's doctor office visits, the hospital records provide an extended history and consistently show Plaintiff's problems resulting from her surgical procedures. The record shows that her medical condition(s) could reasonably be expected to produce her disabling pain and postural limitations.

It should also be noted that the Plaintiff is the mother of three biological children and three adopted children. One of the children was adopted from Korea [a special needs child who also had seizures] and the family had to put the child in a nursing home. [Tr. 319]. The Plaintiff stated at her hearing that she could no longer change or bathe her, and her husband worked full time and sometimes had to go away. [Tr. 325]. The Plaintiff gave up this child because of the pain and limitations of her condition which made her unable to care for this child.

### B.  THE ALJ ERRED IN ASSESSING THE CLAIMANT'S RESIDUAL FUNCTIONAL CAPACITY AND IN CONCLUDING THAT CLAIMANT WAS CAPABLE OF PERFORMING SUBSTANTIAL GAINFUL ACTIVITY

The Plaintiff contends that the ALJ erred in concluding that she had the capacity to perform "light work" through her date last insured and was therefore able to perform substantial gainful activity [Tr. 22, 23].

The ALJ determined that the Plaintiff could perform her prior job as an owner/ operator of a beauty salon, as it is "generally performed," at the light exertional level. [Tr. 23]. At the

hearing, the Plaintiff testified that she did "everything" running her business, i.e., appointments, paperwork purchasing supplies, etc. [Tr. 333-336], In her disability report, the Plaintiff noted she lifted as much as 50 lbs. (the Plaintiff had to lift children in and out of a styling chair)" [Tr. 64].

The vocational expert classified the Plaintiff's prior work as "medium exertional level because she had to handle her own supplies, etc." [Tr. 337]. This would make the job of owner/operator of a beauty salon one that was considered "skilled," and was "occupationally specific." Further, the Dictionary of Occupational Titles only classified this job as "light exertional," when there was no obligation to move supplies, etc.

The ALJ asked the vocational expert which impact symptoms like pain would have upon a person's ability to do any kinds of jobs? - The vocational expert answered:

> "[Y]our Honor, first of all, pain almost in every case, if it is approaching the severe nature, eliminates semi-skilled and skilled work simply because the individual cannot concentrate. ... Further, on unskilled work, if it in fact (sic) pain on a constant and regular basis, the individual not only can not concentrate, they can't attune to a task on a regular basis. If it gets to that point, ever routine work is disrupted because of pain". [Tr. 337-338].

The ALJ asked two hypothetical questions of the vocational expert. Could this individual work if he gave credit to all of the symptoms and limitations that she testified to? The VE's response was no. [Tr. 338]. The second hypothetical question involved "[l]ight exertional work, with a sit/stand option, limited to simple, routine tasks and work that would not involve sustained manipulation." "[T]hey could do tasks requiring frequent or occasional, but not sustained". "[W]ould those, with that profile could you identify any jobs that such a hypothetical might be able to do?" The VE responded yes and proceeded to give examples of

10

unskilled work, i.e. machine, tender, general clerical worker and security worker. [Tr.338].

Also at the hearing, the prior representative offered to amend the Plaintiff's onset date to her 55th birthday, which would have been within her DLI. Given the second hypothetical question, at her 55th birthday, the Plaintiff would have met the requirements of the Medical Vocational Guidelines (the GRIDS), Rule 202.06. (high school graduate or more, does not provide for direct entry into skilled work -skilled or semi-skilled – not transferable - disabled]. Thus, the GRIDS were not applied.

The ALJ concluded that Plaintiff can perform her past relevant work as an owner/operator of a beauty salon, and be self-employed at the light exertional level. [Tr. 23]. The Plaintiff's past work as a beautician required that she stand/walk for eight hours a day, that she was occasionally required to lift up to 50 pounds, (i.e. children for haircuts, order and carry her own supplies). Thus, as actually performed, Plaintiff's work as an owner/beautician constituted at least medium exertional work and exceeded the light work capacity set forth by the ALJ.

Step four of the sequential evaluation process used in Social Security disability determinations requires the ALJ to review the claimant's residual functional capacity and the physical and mental demands of the claimant's past work. See 20 C.F.R. § 404.1520(e)(1996); Nelms v. Bowen, 803 F.2d 1164 (11th Cir. 1986). "[T]he ALJ has a duty to fully investigate and make explicit findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant herself is capable of doing before he determines that she is able to perform her past relevant work." Nimick v. Secretary of Health and Human Services, 887 F.2d 864, 866 (8th Cir.1989)(emphasis in original). These findings require

evidence of the "actual functional demands and job duties of a particular past relevant job" or the "functional demands and job duties of the occupation as generally required by employers throughout the national economy." See Id. n. 2 (quoting Social Security Rulings 82-61 and 82-62). Social Security Ruling 82-62 provides that:

> [t]he decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.

The ALJ only made findings in his decision regarding Plaintiff's ability to perform her past work as "actually performed." [Tr. 21]. The ALJ made no findings of fact regarding Plaintiff's past work as "performed in the national economy."

## IV. CONCLUSION

It is respectfully recommended that the decision of the Commissioner be **REVERSED** and **REMANDED** pursuant to 42 U.S.C. § 405 (g) to allow the Commissioner to re-evaluate the extent of the Plaintiff's residual functional capacity and the medical opinions of record, to consider the combined effect of all impairments, evaluate the extent of all Plaintiff's limitations and to conduct a supplemental hearing to take additional evidence relevant to the plaintiff's impairments and make new findings consistent with this Report and Recommendation.

**Respectfully submitted** in Chambers, Fort Myers, Florida this    16th    day of 2009.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its service shall bar an aggrieved party from attaching the factual findings on appeal and a *de novo* determination by a district judge. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72; *see also* Fed.R.Civ.P. 6; M.D. Fla. R. 4.20.

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to:
All Counsel of Record

John E. Steele, U.S. District Judge

Eva I. Guerra, Esquire
Attorney for the Plaintiff

Susan Roark Waldron, AUSA